STROBEL & WILKEN CO. et al. v. KNOST et al.

(District Court, S. D. Ohio, W. D.    January 20, 1900.)

No. 2,572.

1. BANKRUPTCY—PREFERENCES—PAYMENT OF DEBT.
   Partial payment of a debt in money constitutes a transfer of property, within the meaning of Bankr. Act 1898, § 60a, providing that a debtor shall be deemed to have given a preference, if, being insolvent, he has "made a transfer of any of his property, and the effect of the enforcement of such transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class."

2. SAME—PROOF OF DEBT—SURRENDER OF PREFERENCE.
   Bankr. Act 1898, § 57g, providing that "the claims of creditors who have received preferences shall not be allowed unless such creditors shall surrender their preferences," applies to a partial payment made to a creditor by an insolvent debtor within four months prior to the filing of a petition in bankruptcy against the latter, irrespective of the intention of the debtor to give a preference or of the creditor's knowledge or belief that a preference was intended; and, if such creditor elects to retain the money so received, he will not be permitted to prove the balance of his claim against the estate of the bankrupt.

In Bankruptcy. On review of decision of referee in bankruptcy. The opinion of the referee (Morison R. Waite) was as follows:

"This matter comes before me on two motions,—the first by the trustee to disallow the claim of Henry Gieseking, Jr., administrator of Henry Gieseking, for $1,741.19, on the ground that the said administrator received on December 24, 1898, and on January 4, 1899, preferences, to wit, payments of money, $200 and $1,000 on account; and the other a motion by said Gieseking filed after the other, to disallow the claims of 27 other creditors, all trade creditors, who at various dates after October 6, 1898, also received preferences, to wit, payments in money on account, and for an order directing the repayment of such payments.

"The bankrupt firm was engaged in the wholesale toy business in this city, and doing business entirely, or almost so, on borrowed capital. The business was sold to the bankrupts, February 1, 1896, by Langhorst, and the bankrupts, having no property of their own, paid for the business by their u·secured demand notes to Langhorst for $8,032. Further capital was furnished to the business,—about $3,000 by Henry Gieseking, and $2,000 claimed to have been furnished by a sister of Knost. The firm was also large borrowers from the Western German Bank. On October 26, 1898, the stock of goods of the firm was largely destroyed by fire. The loss was adjusted with the insurance companies in between two and three weeks, who thereafter paid, in accordance with that adjustment, $13,650. Mr. Langhorst thereupon demanded payment of the balance on his notes, which was paid during November and December, aggregating $7,367.07, the last payment being December 10th. The Western German Bank's paper was also taken up, approximately $6,500, the last payment being made to it December 7th. After the fire the stock was straightened up, and the firm went on with business in the ordinary course as quickly as they could. Goods were sold, but no new purchases of any consequence were made, and no new capital was put into the business. Payments to merchandise trade creditors were made in whole or in part from time to time, and

those who were paid in part, and have filed their claims for the balance, are included in Gieseking's motion. Other creditors, some of whose bills matured as early as in October, 1898, before or about the time of the fire, as shown by proofs on file, have not been paid. On January 6, 1899, the firm made an assignment for the benefit of its creditors under the state law. Within a day or two prior to the assignment $2,000 was paid to the sister of Knost, $1,000 to Gieseking, and about $1,000 drawn out in money by Wilhelmy, and over $1,500 by Knost. On February 23, 1899, a petition to have them adjudged bankrupts was filed, and on March 22, 1899, they were so adjudged. On the 13th day of April, 1899, the present trustee was elected. In the meanwhile the assignee had converted the stock into money, and collected most of the accounts, and he turned over to the trustee $7,820.41. The good accounts remaining to be collected are estimated to be $614.14. There are no other assets except doubtful accounts and worthless accounts. The liabilities are $21,896.42. With the exception of $2,500 withdrawn by the bankrupts, $400 paid to the insolvent's attorney, and $770.02 paid by the assignee for commissions and expenses, all the receipts of the firm have gone to pay debts of the firm, for as, confessedly, the months of November and December are the most profitable months of the year in their business, it is fair to disregard expenses of operating. As practically the debts existing at the failure were existing at the time of the fire, for thereafter they created no new liabilities, and those debts exceed assets over two for one, there seems no escape from the conclusion that the firm was actually insolvent, within the meaning of the bankrupt act, at all times after the fire, October 26, 1898. Mr. Wilhelmy, who was the financial man of the firm, testifies that the likelihood of not being able to pay came to him after they were in full possession of the property and opened up the goods that had been destroyed, and they found they were in bad shape; and that they realized they could not pay dollar for dollar when their business was over, about the middle of December, and they went through their stock. There is no claim of any losses after the fire and before this last date, and, as they were then creating no new indebtedness, the insolvent condition must have reached back to the fire. There is no proof as to their condition prior to the fire. This date is within 90 days of the assignment, and 4 months of the filing of petition in bankruptcy. There is no evidence to show that at the time any of the payments were made which are now sought to be reached by these motions the payees had reasonable cause to believe that it was intended thereby to give a preference. Neither is there any evidence to show that the bankrupts intended to give a preference by any of these payments, except the presumptions arising from the situation of the parties, and the knowledge of the bankrupts of their condition.

"In view of the decision of the judge of this court in the case of Hicks v. Knost, 94 Fed. 625, and of the circuit court of appeals of the Fifth circuit in Bernheimer v. Bryan or Re Abraham, 1 Nat. Bankr. N. 281, 35 C. C. A. 592, 93 Fed. 767. I do not consider that I have jurisdiction to order the repayment to the trustee of any payments made by the bankrupts on a summary application such as this, and shall treat both motions simply as motions for reconsideration and disallowance of claims.

"Section 60a of the present bankruptcy act defines a 'preference,' so far as applicable to the above facts, thus: 'A person shall be deemed to have given a preference, if, being insolvent, he has * * * made a transfer of any of his property, and the effect of the enforcement of such * * * transfer will be to enable any one of his creditors to obtain a greater percentage of his debts than any other of such creditors of the same class.' It is contended that the words, 'transfer of any of his property,' cannot mean a payment of money. and particularly a payment made in the usual course of business. The word 'transfer,' however, is defined by the act itself (section 1, subd. 25), and includes any disposing of property as a payment or otherwise. The word 'property,' as ordinarily used, is certainly broad enough to cover money, whether in currency or a bank credit assignable by check. Furthermore, the words of this act must be taken to have the same meaning as in the prior bankruptcy acts, unless the act itself provides otherwise. The word 'property' is not defined by this act, and it was used in the act of 1867. In section 39 of act of 1867, the words, 'transfer of money or other property,' are used, showing 'property' to

include 'money.' In section 35 of that act, 'payment, pledge, assignment, transfer or conveyance of any part of his property' are used unconnected with the word 'money,' and yet that section was held to apply to payments of money. Campbell v. Bank, 14 Wall. 87, 20 L. Ed. 832. These considerations outweigh such inference arising from the use of words in section 60d of the 1898 act, 'pay money or transfer property to an attorney,' etc., as was claimed in argument. It is not to be presumed that congress meant to interdict all fraudulent and preferential transfers of property except money, and permit all payments of money, no matter how fraudulent or preferential, unless made to attorneys.

"Is, then, the question whether or not these payments, made to trade creditors, were made in the usual course of business, relevant? Under the act of 1867, transfers not in the usual course of business were held prima facie evidence of fraud. Section 35 (Rev. St. § 5130). But this did not mean that all transfers or payments in the usual course of business were not preferences, and therefore valid. They might be either one or the other. The question under that act was the intent of the debtor in making the payment or transfer, and whether it was done in usual course of business or not was one circumstance to be considered in connection with all the other circumstances in ascertaining what was the intent. In re George, 1 Low. 409, Fed. Cas. No. 5,325; In re Oregon Bulletin Printing & Publishing Co., 13 N. B. R. 503, Fed. Cas. No. 10,559. In the act of 1898, so far as section 60a is concerned, the intent of the debtor and the knowledge of the creditor are alike immaterial. If the bankrupts are insolvent,—and I have found they were at all times after October 26, 1898,—then any payments they made, either in full or on account of their indebtedness, and not in compromise of it, at less than its face value, must operate, if enforced, as a preference, i. e. to enable those creditors paid to obtain a greater percentage of their debts than others of the same class, and the question whether the payments were made in the usual course of business or not is immaterial so far as that section is concerned, because it can only bear on the questions of the intent and the knowledge of the parties. Under this construction of section 60a, all payments made after October 26, 1898, must be held to have created preferences.

"It remains to consider what is the effect of such preferences. Section 60b provides when they may be avoided by the trustee and recovered back, and it is essential, under that provision of the act, that, in addition to the fact of preference as above defined, it be shown that the person receiving the preference had reasonable cause to believe that it was intended thereby to give a preference. Section 3a, subd. 2, provides when the giving of a preference constitutes an act of bankruptcy. Under its terms, it is necessary to show that the debtor intended to give a preference, but it is not necessary to show that the creditor had reasonable cause to believe it was so intended. In other words, a preferential transfer may be sufficient to make the transferror a bankrupt, although not of such a character that the trustee may recover it back. The same distinction existed under the act of 1867. In re Drummond, 1 N. B. R. 231, 234, Fed. Cas. No. 4,093; In re Oregon Bulletin Printing & Publishing Co., 13 N. B. R. 503, 514, Fed. Cas. No. 10,559; Loveland, Bankr. § 52.

"Neither of these two sections is, however, directly applicable to the question under consideration, and they are only useful as aids in ascertaining the correct construction of section 57g, which is the provision directly in point. It reads: 'The claims of creditors who have received preferences shall not be allowed unless such creditors shall surrender their preferences.' Does this refer to 'preferences' as defined in section 60a, or does it refer to such preferences as may be recovered back by the trustee under section 60b, or such preferences under section 3a, subd. 2, as constitute the debtor a bankrupt? It seems to me that, independently of the arguments as to the policy of the act to be hereafter considered, the natural construction would be to consider the word 'preferences' in section 57g to mean those within the definition given in section 60a, for the latter contains the simple definition of a preference, while to the act of preference, as so defined, section 60b and section 3a, subd. 2, each add other and different circumstances to be proved to entitle one to the relief, respectively, provided by each. In section 57g no such other circumstance is added. This view is rendered conclusive, to my mind, when the provision of the act of 1867, analogous to section 57g of the act of 1898, is compared with it. Section

23 of the act of 1867, being section 5084, Rev. St., provided: 'Any person who * * * shall have accepted any preference, having reasonable cause to believe that the same was made or given by the debtor contrary to any provision of this act, shall not prove the debt or claim * * * until he shall have first surrendered to the assignee all property, money, benefit, or advantage received by him under such preference.' That congress in 1898 should have omitted from section 57g the foregoing clause in reference to the cause for belief on the part of the creditor seems to me conclusive that the facts in section 60a, and not those in section 60b, were intended by the use of the word "preferences' alone. Coll. Bankr. p. 285. A similar distinction is apparent in other parts of the act. Under the provisions of the act of 1867, the lien of a judgment obtained within four months was valid, unless brought within the terms of section 35 (section 5128, Rev. St.); that is, unless two facts concurred with the insolvency of the debtor—First, a reasonable ground of belief by the judgment creditor that the debtor was insolvent; and also, second, some active participation by the debtor in securing the judgment. Wilson v. Bank, 17 Wall. 473, 21 L. Ed. 723; Clark v. Iselin, 21 Wall. 360, 22 L. Ed. 568. Under the act of 1898, however, all liens obtained by legal proceedings against an insolvent within four months of the filing of a petition in bankruptcy against him shall be null and void if he is declared a bankrupt, and it is not made necessary to show the knowledge or cause for belief on the part of the judgment creditor. Section 67f. In other words the present act, unlike that of 1867, does not seek to protect the diligent creditor, except in the respect hereinafter pointed out, no matter how innocent of an intent to secure a preference he may be. The act rather aims to secure, as far as practicable, to all general creditors of actual insolvents an equal percentage of their assets, and to prohibit the obtaining by one or a few creditors of any preference in those assets, without reference to the intent with which such preference is given or obtained.

"It was very forcibly urged on argument that such a construction of the act would upset all business relations, and that no creditor would be safe in investing any payments he might receive from his debtors for a period of four months, for fear that his payors might become bankrupts within that time, and that no reliance could in consequence be put upon assets or credits. That objection is a forcible one, and should lead a court to hesitate to adopt a construction from which there is any escape to which it really applies. It seems to have been considered by congress, and so far led it to depart from the scheme of absolute equality of distribution as to protect the diligent creditor from being compelled to surrender any property or contractual lien which he has innocently received in payment or as security; for, under section 60b, to compel its return he must be shown to have had reasonable cause to believe that it was intended as a preference. It does not apply, however, with a like force to the provisions of either section 57g or section 67f,—not to the latter, because, naturally, no such great reliance in making arrangements for future business is placed on mere liens obtained by judicial proceedings within four months; not to the former, because the question of surrender under that section (57g) is entirely voluntary and optional with the creditor, who can determine whether it is worth his while, in view of future dividends, to surrender his preference or not. Nor can it be claimed that the value of the unpaid portion of the credit is unduly unsettled. The debtor being insolvent, the account is not properly entitled to reliance as an asset or basis for future activity. As frequently pointed out under the old act, from the moment of actual insolvency all creditors become entitled to share pro rata in the estate, because it represents the credit given the insolvent by his creditors, and in good morals belongs to them, and not to him. In re Oregon Bulletin Printing & Publishing Co., 13 N. B. R. 503–515, Fed. Cas. No. 10,559; In re Silverman, 4 N. B. R. 522–527, Fed. Cas. No. 12,855. And it is certainly not inequitable to require one who has received an undue portion of that estate, no matter if innocently, from surrendering that advantage before participating in further distributions of it with those who have not received such preference. Coll. Bankr. p. 286.

"So, rather than detracting from the construction I have placed on section 57g, it seems to me that the argument now under consideration makes for it, as pointing out a reason for the distinction made by the different language employed in sections 60b, 57g.

"Counsel have furnished me with citations to a number of authorities arising under the act of 1867, holding that reasonable cause for belief, etc., on the part of the creditor, was necessary before the preference could be avoided,—a proposition which is undisputed under the terms of that act, or section 60b of this act,—and also that payments made in the usual course of business are not preferential and recoverable. In some of the cases cited this doctrine is merely expressed as a dictum. In others, and the case of Clark v. Iselin, 21 Wall. 360, 22 L. Ed. 568, is the strongest of this kind, the fact of being made in the ordinary course of business is but one circumstance, with others, to determine the intent of the debtor and the knowledge or cause for belief of the creditor. On examination of the Clark Case, it will be found at the time of the payment in course of business there was no evidence that the payee had knowledge of the insolvency of the bankrupt,—a fact that had to be proved under that law. Also citations to cases in other states, construing anti-preference laws of those states, are of little assistance in this inquiry, because of the wide variance in the language of the several acts, both from each other and from the federal laws. I have found nothing in any of the authorities cited that is in conflict with the views here expressed.

"Reliance is also placed by the trustee on the provisions of Act 1898, §§ 67e, 70e (which give him the same advantages in recovering property that the creditors might have under state laws); and also, in connection therewith, on the recent act of the Ohio legislature (93 Ohio Laws, p. 290), which took effect November 1, 1898, providing that every transfer, act, or device done by a debtor in contemplation of insolvency, or with a design to prefer one or more creditors, to the exclusion, in whole or in part, of others, shall be void at the suit of creditors, and that such transfer, act, or device, in the event of a deed of assignment being filed within 90 days thereafter, shall be conclusively deemed and held to be fraudulent, upon showing of actual insolvency at the time. I have not found any reason to disagree with the views presented on behalf of the trustee in this connection, but as it is the effect of the views already expressed that, under the terms of the bankruptcy act itself, the motions to disallow all claims in which payments were made subsequent to October 26, 1898, must be granted, and as this goes back further than the Ohio law, which did not go into effect until November 1st, I have not found it necessary to give careful attention to its provisions. If any creditors affected hereby deem themselves entitled to special consideration by virtue of section 60c, they will be given opportunity to present such evidence and arguments as they desire for that purpose. Creditors can then determine whether to surrender their preferences, and have their claims allowed in full or not. The claims of those not doing so, who received payments subsequently to October 26th, must be disallowed. Opportunity will also be given for presenting the questions here passed on for review by the district judge in such manner as counsel may deem best adapted to protect the interests of their clients."

W. A. Hicks, trustee in bankruptcy, pro se.
W. II. Jones, for creditors.

THOMPSON, District Judge. This matter is submitted to the court on a petition for the review of the findings and rulings of the referee in disallowing the claims of certain creditors. The able opinion of the referee in support of his rulings presents the true construction of the provisions of the bankrupt act covering the controversy. When insolvency overtakes the debtor, his creditors, as contributors to the estate in his possession, have an equitable right to have the proceeds of the estate distributed among them equally, in proportion to the amount of their respective claims; and if, pending the insolvency, one of the creditors receives partial payment of his claim from the debtor, and to the extent of the remainder of his claim is permitted to share equally in the distribution of the balance of the estate, he thereby obtains an inequitable advantage or preference

over the other creditors. And this is true, although no preference was intended by the debtor in making, or by the creditor in receiving, the partial payment. The construction, therefore, of paragraph "g" of section 57 and of paragraphs "a" and "b" of section 60 of the bankrupt act, which requires the creditor to surrender his preference as a condition precedent to participation in the distribution of the fund in the hands of the trustee, is not unreasonable. It permits the innocent creditor, at his option, to retain or surrender the preference. But the creditor who has reason to believe that a preference was intended has no such option, and, i' made within four months before the adjudication in bankruptcy, the trustee may recover the amount of the payment. The findings of the referee are approved.